WISCONSIN NATURAL GAS COMPANY, Plaintiff and Respondent, vs. EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, Defendant and Respondent: LIBERTY MUTUAL INSURANCE COMPANY, Defendant and Appellant.

*March 31—May 5, 1953.*

634

636

For the appellant there were briefs by *Otjen & Otjen* of Milwaukee, and oral argument by *Carl Neprud Otjen.*

For the respondent Wisconsin Natural Gas Company there was a brief by *Shaw, Muskat & Paulsen,* attorneys, and

*Robert W. Haight* of counsel, all of Milwaukee, and oral argument by *Mr. Haight.*

For the respondent Employers Mutual Liability Insurance Company of Wisconsin there was a brief by *Quarles, Spence & Quarles,* attorneys, and *Kenneth P. Grubb, Richard S. Gibbs,* and *Edmund W. Powell* of counsel, all of Milwaukee, and oral argument by *Mr. Gibbs.*

FAIRCHILD, J.  On June 6, 1949, defendant Ingbretson, traveling from Park Falls to Milwaukee, reached a point about seven miles south of West Bend on Highway 55 when he drove off the highway, struck a utility pole belonging to plaintiff, and caused the damage complained of. The evidence shows clearly that he was tired, and that in the 269 miles he had driven from Park Falls he had realized he was somewhat fatigued. He stopped his automobile three times to rest. On two of these occasions he slept for a period of time. While his weariness is conceded, it is suggested as a defense in his behalf that his conduct indicated that Ingbretson was acting in an extremely cautious manner. However, the responsibility was his. He failed in a duty to act with ordinary care, and the resulting damage to plaintiff's property was caused by his negligence. His condition is disclosed by his testimony. "I was tired, but I—I don't know how to explain it. I didn't want to sleep. I mean, I wasn't in a position I wanted to sleep. . . . I was and I wasn't; I don't know how to answer it." He didn't remember seeing the telephone pole. He testified: "All I remember is, vaguely, is the car hit the shoulder and it—the car just jumped. And knowing I went through the telephone pole or anything, I don't know. I flew out of the car. I was knocked out for a matter of seconds. . . . I assume I was asleep."

It is considered the trial court very properly found Ingbretson negligent as a matter of law. The fact of going to sleep while driving an automobile is a proper basis for an inference of negligence, and when the driver is conscious of drowsiness, he cannot go to sleep while driving and escape liability.

for in such an event he has relaxed the vigilance which the law required of one so engaged. Because he is conscious of his fatigue and drowsiness, it lies within his own control to keep awake or cease from driving. We agree with the trial court that the doctrine of the case of *Eleason v. Western Casualty & Surety Co.* 254 Wis. 134, 35 N. W. (2d) 301, is applicable, because the driver possessed the knowledge that he was likely to lose consciousness, and that is the point here. And with the essential fact of knowledge of his condition on the part of the driver established, a question of law arises. *Krantz v. Krantz,* 211 Wis. 249, 248 N. W. 155; *Tennes v. Tennes,* 320 Ill. App. 19, 50 N. E. (2d) 132; 5 Am. Jur., Automobiles, p. 605, sec. 180; Anno. 28 A. L. R. (2d) 20.

The question of importance to all parties is whether the policy of insurance issued by Liberty Mutual to Ingbretson was effectively canceled prior to the time Ingbretson drove off the highway and struck the plaintiff's pole. It is contended by Ingbretson (1) that the notice of cancellation was ineffective because it was ambiguous and equivocal; (2) that if the notice is adequate in form, there was a failure to comply with the policy provisions respecting cancellation; and (3) that the insurer is estopped to deny the evidence of a valid contract of insurance.

The policy in question was issued in September of 1948 to expire in September of 1949. A dividend on a previous year's policy was applied as part payment on the policy in question. Ingbretson requested a deferred premium-payment plan so that he could pay the premium over a period covering the first five months of the policy year. Subsequent to the issuance of the policy, Ingbretson requested that his policy be changed from 10/20 and $100 deductible to 5/10 and $250 deductible. The evidence is that Ingbretson never made any payments beyond the dividend which was applied as part payment.

This brings us to the point of the insurance company's claim that the policy was duly canceled by the mailing on

April 26, 1949, of the following notice to Ingbretson and to the Household Finance Corporation from which Ingbretson had a loan on his car. The notice reads:

"In accordance with the provisions of the policy contract, we hereby cancel policy No. 4–4930–NL said cancellation to be effective as of 12:01 a. m. standard time, May 10, 1949."

Included with this notice was a separate card which reads:

"The protection afforded by your insurance will terminate on the cancellation date specified in the attached letter.

"If your check for the entire premium balance is received prior to the date of cancellation we shall gladly reinstate your coverage and continue your insurance protection without interruption."

In support of its claim of having mailed the notice and card, Liberty Mutual offered in evidence two post-office forms indicating that the post office had received on said date of mailing "one piece of ordinary mail" addressed to Ingbretson, Sr., and "one piece of ordinary mail" addressed to Household Finance Corporation. An employee of the insurance company also testified as to the mailing of the notice.

The Liberty Mutual policy, with respect to cancellation provides:

"*Cancellation*: This policy may be canceled by the named insured by mailing to the company written notice stating when thereafter such cancellation shall be effective. This policy may be canceled by the company by mailing to the named insured at the address shown in this policy written notice stating when not less than five days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice and the effective date of cancellation stated in the notice shall become the end of the policy period. . . ."

The indorsement of a so-called loss-payable clause in favor of the mortgagee, Household Finance Corporation, reads as follows:

"It is agreed that in the event of cancellation of the policy the company will give five days' written notice thereof to

Household Finance Corporation, 212 West Wisconsin ave., Milwaukee, Wisconsin, and that such cancellation shall not become effective until the date specified in such notice."

The evidence is, therefore, undisputed that the notices of cancellation were mailed on April 26, 1949, although there is testimony to the effect that the notices were not received by Ingbretson or Household Finance Corporation. However, Wisconsin adheres to the rule that where the provision for notice is stated in the contract and cancellation is to be accomplished by proof of mailing, this meets the demand. *Heimbecher v. Johnson,* 258 Wis. 200, 45 N. W. (2d) 610; 29 Am. Jur., Insurance, p. 265, sec. 285. It is provided that cancellation of the policy may be accomplished by the company's mailing of written notice to the named insured at the address shown in the policy. In the indorsement of a so-called loss-payable clause in favor of Household Finance Corporation, it appears that written notice is to be given. As to the suggestion that there is a different method of notice required as to the Household Finance Corporation from that required as to the insured, Ingbretson, we hold that where a plan of general intention as to the manner and form of notice is set forth, that plan prevails throughout the contract, unless a provision is inserted which specifically creates an exception. Where a method is fixed, the same meaning is to be applied where notice is referred to, unless it appears from the context or otherwise that words were used in a different sense.

As to the point that the notice of cancellation was ineffective because it was ambiguous and equivocal, defendant Liberty Mutual insists that the letter and the accompanying card were an unequivocal notice of cancellation, and that the inclosed card strengthened rather than weakened the cancellation. Defendant Ingbretson contends that the two pieces of writing must be read as a whole, and that the inclosed card with the notice of cancellation destroyed the effectiveness and voided the cancellation.

It is of course correct to say that, to determine the sufficiency of a notice of cancellation, it must be examined in its entirety. And there may be instances where an attempted cancellation fails in its purpose because of an intervening effort to continue a contract in force for the purpose of collection or because the notice given constitutes no more than a threat to cancel, as contrasted with one which states unequivocally that cancellation is to be effective as of a certain definite time. There are cases holding that insufficient or ineffectual attempts without suit to collect an overdue premium, after the policy by its terms has become invalidated by nonpayment, preclude the insurer thereafter from claiming an effective cancellation and requiring it to fulfil the contract. Such latter cases are inconsistent with the cases which hold that a demand of a premium "can certainly not amount to an election or surrender of any defense, where the premium has already been earned because the risk attached, and the insurer is entitled to the premium even though the policy is no longer continued in force." 3 Williston, Contracts (rev. ed.), p. 2150, sec. 761.

In the case at bar the notice sent by the company clearly expressed an election to cancel the policy. It set forth a specific time when the cancellation would be effective. There is nothing in any part of the notice or the accompanying card that may fairly be said to amount to a retraction or modification of the cancellation. It was there said: "The protection afforded by your insurance will terminate on the cancellation date specified in the attached letter." Such notice was clearly an effective notice to terminate the policy under the decision of the Washington supreme court in *Trinity Universal Ins. Co. v. Willrich*, 13 Wash. (2d) 263, 124 Pac. (2d) 950, and the notice in the instant case is clearly distinguishable from those in the cases relied upon by the trial judge and urged upon the argument here.

In *John R. Davis Lumber Co. v. Hartford Fire Ins. Co.* 95 Wis. 226, 239, 70 N. W. 84, this court stated: "There

must be an actual notice of cancellation, . . . not . . . a notice that the policy will be canceled." The foregoing quotation clearly states the distinction between the two lines of cases holding notices of cancellation to be effective or not effective. If the notice is to be construed as a threat to cancel (if the premium is not paid), then it is not effective; but if it states absolutely that the policy is canceled (as did the notice in the instant case), then it is effective, and the wording of the inclosed post card did not have the effect of making the notice of cancellation a mere threat.

The insured and his mortgagee were thereby notified that only by paying the entire premium would the insured be given further protection. In a cancellation, "it is only necessary that the company positively, distinctly, and unequivocally indicate to the insured that it is its intention that the policy shall cease to be binding as such upon the expiration of five days from the time when this intention is made known to the insured." *American Glove Co. v. Pennsylvania Fire Ins. Co.* 15 Cal. App. 77, 82, 113 Pac. 688; 3 Joyce, Law of Insurance (2d ed.), pp. 2827–2831, secs. 1670–1670b.

The facts before us are readily distinguishable from those appearing in such cases as *Suennen v. Evrard,* 254 Wis. 565, 569, 36 N. W. (2d) 685. As pointed out by defendant Liberty Mutual, in that case a policyholder wished to cancel a policy on one machine and obtain new coverage for another. There was a failure to state when the cancellation should be effective. The court used the following language in disposing of the cancellation questions: "Even though he were the agent of Evrard his authority was conditioned upon obtaining another policy upon Evrard's car." In the facts established in the case at bar it is beyond all question that the policy was ended, and the insured was notified that unless he entered into a new contract by making a payment of premium, no further protection would be given.

As to estoppel, Ingbretson testified that sometime prior to May 10, 1949, he telephoned Metz, an employee of Liberty

Mutual who had issued the policy, and asked for a statement of the amount due as premium, but that he did not receive one. Later, on May 9, 1949, one day prior to the date of cancellation of the policy, a Mr. Mann, a representative of Household Finance Corporation, called on Ingbretson to see about getting a policy loss-payable clause in favor of Household Finance Corporation. In the presence of Mann, Ingbretson phoned Liberty Mutual and talked to a Mrs. Johnston. According to Ingbretson, Mrs. Johnston told him that his policy was in force and effect. Mr. Mann testified that Ingbretson stated, after the conclusion of the telephone conversation with Mrs. Johnston, that Ingbretson would have insurance coverage by renewal and that Liberty Mutual would send another loss-payable clause to Household Finance Corporation. Mrs. Johnston testified that Ingbretson, in his telephone conversation, mentioned receipt of the cancellation notice and wanted to know what he would have to do to renew his coverage, and she told him that he would have to make a small payment to apply on the premium. She further stated that the reason she remembered the conversation so clearly, which had taken place three years before she testified, was that she reported the same to her superior, Mr. Metz, and he rebuked her for having made an error in stating to Ingbretson that only a small payment would be required, when actually under the rules of the company the entire balance would have had to be paid.

There clearly was no coverage by estoppel. Ingbretson could not assume that the policy would be continued indefinitely without some payment on the premium. The fact that he may have had coverage on May 9, 1949, should not have misled him into thinking that the policy would continue indefinitely without entering into a new arrangement by paying the premium.

There is no appeal here from the judgment dismissing the complaint as against the Employers Mutual, or motion of review with respect to the same. However, Employers Mu-

tual did file a brief on this appeal, and its counsel presented oral argument, which brief and argument were in direct opposition to the position taken by the appellant Liberty Mutual, and for that reason the appellant is entitled to tax costs against Employers Mutual as well as against the plaintiff and Ingbretson.

*By the Court.*—Judgment reversed as to the defendant Liberty Mutual Insurance Company only, and cause remanded with directions to dismiss the complaint and cross complaint against said defendant. The appellant shall be entitled to tax costs in accordance with the last paragraph of the opinion.